UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

REGINALD LETT,

        Petitioner,

                                            Civil No. 04-10018

v.                                           Honorable David M. Lawson

PAUL RENICO,

        Respondent.
_____/

## OPINION AND ORDER GRANTING PETITION FOR WRIT OF HABEAS CORPUS

The question presented by petitioner Reginald Lett's petition for writ of habeas corpus is whether the Michigan Supreme Court unreasonably applied United States Supreme Court precedent, specifically *Arizona v. Washington*, 434 U.S. 497 (1978), when it found that Lett could be subjected to a second trial for first-degree murder after a state trial judge declared a mistrial during Lett's first trial when the jury did not reach a verdict after four hours of deliberation and the judge failed to give any reason for doing so. Lett is a state prisoner currently confined at the St. Louis Correctional Facility in St. Louis, Michigan. In his petition for a writ of habeas corpus filed through counsel pursuant to 28 U.S.C. § 2254, Lett contends that his state court conviction of second-degree murder, Mich. Comp. Laws § 750.317, and possession of a firearm during the commission of a felony, Mich. Comp. Laws § 750.227b, following his second trial in 1997 violated the Double Jeopardy Clause. After reviewing the record, the Court concludes that the state trial judge's decision to grant a mistrial did not amount to the exercise of sound discretion, there was no manifest necessity for terminating jury deliberations, and the state supreme court's conclusions to the contrary amount to an unreasonable application of federal law as determined by the Supreme Court. The Court, therefore, will grant the petition for writ of habeas corpus.

I.

The petitioner's convictions arise from the shooting death of Adesoji Latona at a party store in Detroit, Michigan on August 29, 1996. Latona was a taxicab driver who apparently was confronted by a group of three men, including Lett, as he entered a liquor store in Detroit, Michigan. An argument broke out inside the store when one of the men in the group, Charles Jones, took issue with Latona's earlier action of throwing him out of the cab. Latona's girlfriend, Djuana Bradley, testified that Jones confronted Latona in the store. Other witnesses described Jones as being angry, and when Latona pushed Jones, a "tussle" ensued. Bradley and the petitioner tried to intervene, and Bradley said she saw the petitioner draw a gun. She ran to the back of the store and heard two gunshots.

Afterward, petitioner Lett gave a statement to the police in which he admitted that he was at the party store and saw Jones "[get] into it with this guy." Lett said that he retrieved a gun from the car outside when he saw Latona push Jones, and thereafter Lett went back into the store. Lett admitted that he and Jones had fought with Latona inside the store before Lett first went outside. When he saw the men still fighting upon reentering the store, Lett said he fired the gun once into the air, then he ran back outside.

The medical examiner testified at the first trial that Latona died from two gunshot wounds, one to the head and one to the chest.

Other witnesses testified at trial as well. Two other witnesses who testified at the preliminary examination could not be located for trial, and their prior testimony was read to the jury. The first trial spanned a ten-day period, and it appears from the record that testimony was taken intermittently over parts of four days, although the proceeding itself took place over parts of seven

days. The trial judge instructed the jury on June 12, 1997 and sent the jurors out to begin deliberations at 3:24 p.m. that day. They were excused shortly thereafter at 4:00 p.m. The opinion filed by the Michigan Supreme Court in this case reports that during deliberations, the jury sent a total of seven notes to the trial judge, *see People v. Lett*, 466 Mich. 206, 209 n.2, 644 N.W.2d 743, 745 n.2 (2002), but the record in this court contains no evidence of that. Apparently, the jury returned to deliberate on June 13, 1997, although the record does not contain the time of day deliberations recommenced. It is clear, however, that shortly after noon on that same day, the jury returned to the courtroom to discuss a note inquiring what would happen if the jurors could not agree. The following then ensued:

> THE COURT: Let's bring the jury out.
> THE DEPUTY: Would you take your seats in the jury box, please?
> (At about 12:45 p.m. - jury returned)
> THE COURT: You may be seated. Is the jury present and properly seated, counsel?
> MR. HEAPHY: Yes, your Honor.
> MR. GORDON: Yes, Judge.
> THE COURT: I received your note asking me what if you can't agree? And I have to conclude from that that that is your situation at this time. So, I'd like to ask the foreperson to identify themselves, please.
> THE FOREPERSON: My name is Janice Bowden.
> THE COURT: Okay, thank you. All right. I need to ask you if the jury is deadlocked; in other words, is there a disagreement as to the verdict?
> THE FOREPERSON: Yes, there is.
> THE COURT: All right. Do you believe that it is hopelessly deadlocked?
> THE FOREPERSON: The majority of us don't believe that –
> THE COURT: (Interposing) Don't say what you're going to say, okay?
> THE FOREPERSON: Oh, I'm sorry.
> THE COURT: I don't want to know what your verdict might be, or how the split is, or any of that. Thank you. Okay? Are you going to reach a unanimous verdict or not?
> THE FOREPERSON: (No response)
> THE COURT: Yes or no?
> THE FOREPERSON: No, Judge.
> THE COURT: All right. I hereby declare a mistrial. The jury is dismissed.
>
> (At about 12:48 p.m. - jury discharged)

> THE COURT: Well, Mr. Gordon snuck away before we could set a new trial date.
> THE DEPUTY: He's coming back, Judge.
> THE COURT: Okay. It is going to be November 24th. I'll remand. Set a pretrial.
> THE CLERK: Do you want a pretrial date for June 27th?
> THE COURT: Okay. Take him in the back before we bring the jury out.
> (At about 12:49 p.m. - jury discharged)
> (At about 12:50 p.m. - proceedings concluded)

Trial. Tr. at 320-21 (June 13, 1997).

A second trial occurred in November 1997 before a different judge at which the defendant was convicted of felony firearm and the lesser offense of second-degree murder. The trial court subsequently sentenced the petitioner to sixteen to forty years imprisonment on the second-degree murder conviction and a consecutive term of two years imprisonment on the felony firearm conviction.

On appeal, the petitioner argued that there was no necessity to declare the mistrial after the case had been submitted to the first jury and therefore the second trial placed him in jeopardy twice, in violation of his constitutional rights. The Michigan Court of Appeals agreed, rejecting the State's argument that the petitioner had consented to the mistrial, finding instead that "[t]he trial court declared the mistrial sua sponte and there is absolutely no indication in the record that defendant consented to this action." *People v. Lett*, 2000 WL 33423221, *2 (Mich. App. April 21, 2000) (unpublished). The court then determined that because the trial judge declared a mistrial without a hearing, consideration of any alternatives, giving the jury a "deadlock instruction," or even determining that the jury in fact was deadlocked, the mistrial was declared improperly and the retrial violated the petitioner's double jeopardy rights as guaranteed by the United States and Michigan Constitutions, and that court reversed his convictions. *People v. Lett*, 2000 WL 33423221 at * 3-*4.

The State appealed that decision to the Michigan Supreme Court. A majority of that court held that the retrial did not violate the constitutional bar against successive prosecutions because there was sufficient justification for the declaration of mistrial. The court reasoned that although the trial judge did not herself attempt to justify the decision to declare a mistrial, the record contained "sufficient justification for the mistrial declaration." *People v. Lett*, 466 Mich. 206, 218, 644 N.W.2d 743, 750 (2002). The court endorsed the well-accepted proposition that a trial judge's decision to declare a mistrial upon determining that a jury is deadlocked is entitled to great deference, and consideration of alternatives or holding a hearing on the subject is not mandatory. *Id.* at 221, 644 N.W.2d at 751-52. Nor is it necessary to give the jury additional instructions to address the possible deadlock. *Id.* at 222-23, 644 N.W.2d at 752. The court then concluded:

> The jury had deliberated for at least four hours following a relatively short, and far from complex, trial. The jury had sent out several notes over the course of its deliberations, including one that appears to indicate that its discussions may have been particularly heated. Most important here is the fact that the jury foreperson expressly stated that the jury was not going to reach a verdict. We conclude that, in the absence of an objection by either party, the declaration of a mistrial in this case constituted a proper exercise of judicial discretion.

*Id.* at 223, 644 N.W.2d at 753 (footnote omitted). Two justices dissented on the ground that the record contained no evidence that the trial judge exercised sound discretion in deciding to declare a mistrial, as United States Supreme Court precedent requires. *Id.* at 226-28, 644 N.W.2d at 754-55. The court reversed the state court of appeals and remanded the case to that court for consideration of other appellate issues not addressed by that court, which are not pertinent here. On remand, the Michigan Court of Appeals concluded that the remaining issue lacked merit and affirmed the petitioner's convictions. *See People v. Lett*, 2002 WL 1797254 (Mich. App. Aug. 2,

2002) (unpublished). The Michigan Supreme Court subsequently denied leave to appeal. *See People v. Lett*, 467 Mich. 953, 656 N.W.2d 529 (2003) (table).

The petitioner filed the present petition for a writ of habeas corpus on January 29, 2004, raising as his sole claim the violation of his rights under the Double Jeopardy Clause. The respondent filed an untimely answer to the petition, despite extension of time sought and granted by this Court. The thrust of the respondent's arguments is that the petitioner consented to the mistrial, and the state courts' determination that a mistrial was justified by manifest necessity was reasonable.

II.

The provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1996), which govern this case, "circumscribe[d]" the standard of review federal courts must apply when considering applications for a writ of habeas corpus raising constitutional claims. *See Wiggins v. Smith*, 539 U.S. 510, 520 (2003). As amended, 28 U.S.C. § 2254(d) imposes the following standard of review for habeas cases:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). Therefore, federal courts are bound by a state court's adjudication of a petitioner's claims unless the state court's decision was contrary to or involved an unreasonable

application of clearly established federal law. *Franklin v. Francis*, 144 F.3d 429, 433 (6th Cir. 1998). Mere error by the state court will not justify issuance of the writ; rather, the state court's application of federal law "must have been objectively unreasonable." *Wiggins*, 539 U.S. at 520-21 (quoting *Williams v. Taylor*, 529 U.S. 362, 409 (2000) ( internal quotes omitted)). Additionally, this Court must presume the correctness of state court factual determinations. 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct."); *see also West v. Seabold*, 73 F.3d 81, 84 (6th Cir. 1996) (stating that "[t]he court gives complete deference to state court findings of historical fact unless they are clearly erroneous").

The Supreme Court has explained the proper application of the "contrary to" clause as follows:

> A state-court decision will certainly be contrary to [the Supreme Court's] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases. . . .
>
> A state-court decision will also be contrary to this Court's clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from [the Court's] precedent.

*Williams*, 529 U.S. at 405-06.

The Supreme Court has held that a federal court should analyze a claim for habeas corpus relief under the "unreasonable application" clause of § 2254(d)(1) "when a state-court decision unreasonably applies the law of this Court to the facts of a prisoner's case." *Id.* at 409. The Court defined "unreasonable application" as follows:

> [A] federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable. . . .
>
> [A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law. . . . Under § 2254(d)(1)'s "unreasonable application" clause, then, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.

*Id.* at 409, 410-11. *See also Davis v. Coyle*, 475 F.3d 761, 766 (6th Cir. 2007); *King v. Bobby*, 433 F.3d 483, 489 (6th Cir. 2006); *Harbison v. Bell*, 408 F.3d 823, 828-29 (6th Cir. 2005); *Rockwell v. Yukins*, 341 F.3d 507, 512 (6th Cir. 2003) (en banc).

In this case, the petitioner seeks relief on the ground that his retrial after the declaration of a mistrial violated the Double Jeopardy Clause of the Fifth Amendment. The Fifth Amendment to the United States Constitution commands that no "person be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V. The Double Jeopardy Clause protects against a second prosecution for the same offense after acquittal or conviction and protects against multiple punishments for the same offense. *North Carolina v. Pearce*, 395 U.S. 711, 717 (1969); *Ohio v. Johnson*, 467 U.S. 493, 497 (1984). The Double Jeopardy Clause also bars the State from making repeated attempts to convict an individual for an alleged offense, *United States v. Dinitz*, 424 U.S. 600, 606 (1976), and protects a defendant's right to have his trial completed by a particular tribunal, *Arizona v. Washington*, 434 U.S. 497, 503-04 (1978). Jeopardy attaches in a criminal trial once the jury is impaneled and sworn. *Critz v. Bretz*, 437 U.S. 28, 38 (1978). The state courts acknowledged and discussed all of these basic tenets.

Similarly, the state courts observed, and the petitioner agrees, that when a criminal proceeding is terminated prior to a resolution on the merits, retrial is not automatically barred.

However, once jeopardy attaches, prosecution of a defendant before a jury other than the original jury may proceed only if the defendant requests or consents to a mistrial or if there is a "manifest necessity" for a mistrial. *Arizona*, 434 U.S. at 505; *United States v. Perez*, 22 U.S. (9 Wheat) 579, 580 (1824); *Watkins v. Kassulke*, 90 F.3d 138, 141 (6th Cir. 1996).

The respondent argues before this Court that the petitioner consented to the mistrial declaration because he failed to object in the trial court. That argument was advanced in the state courts as well, and rejected. As mentioned earlier, the state court of appeals found as a matter of fact that the record contained no evidence of consent on the part of the petitioner, and the respondent has presented nothing to this Court that justifies upsetting that finding. *See* 28 U.S.C. § 2254(e)(1); *West*, 73 F.3d at 84. Therefore, because the petitioner neither requested nor consented to the mistrial in this case, the issue before the Court is whether manifest necessity existed for granting the mistrial. *Compare United States v. Gantley*, 172 F.3d 422, 429 (6th Cir. 1999) (explaining that "a defendant's failure to object to a mistrial implies consent thereto only if the sum of the surrounding circumstances positively indicates this silence was tantamount to consent," and finding consent only after the trial judge "(1) heard Gantley's counsel's suggestion that [the trial judge]'s own reaction caused Gantley incurable prejudice; (2) considered the possibility of an alternative course of action; (3) decided there was no viable alternative to a declaration of a mistrial; and (4) essentially invited an objection by asking counsel if there was 'anything else' to address").

"Manifest necessity" is a term of art that has come to mean a "high degree" of necessity. The Supreme Court explained:

> The words "manifest necessity" appropriately characterize the magnitude of the prosecutor's burden. For that reason Mr. Justice Story's classic formulation of the test has been quoted over and over again to provide guidance in the decision of a wide variety of cases. Nevertheless, those words do not describe a standard that can

be applied mechanically or without attention to the particular problem confronting the trial judge. Indeed, it is manifest that the key word "necessity" cannot be interpreted literally; instead, contrary to the teaching of Webster, we assume that there are degrees of necessity and we require a "high degree" before concluding that a mistrial is appropriate.

*Arizona*, 434 U.S. at 505-06 (footnotes omitted).

It is the state supreme court's determination that the record in this case demonstrates a "high degree" of necessity to declare a mistrial that the petitioner challenges, and with which this Court cannot agree.

To be sure, the manifest necessity doctrine does not require a finding that the trial court had no alternative but to declare a mistrial. *Harpster v. State of Ohio*, 128 F.3d 322, 328 (6th Cir. 1997). A mistrial premised upon jury deadlock has been "long considered the classic basis for a proper mistrial." *Arizona*, 434 U.S. at 509; *see also Richardson v. United States*, 468 U.S. 317, 323-24 (1984). And reviewing courts must give considerable deference to a trial court's determination that manifest necessity warrants a mistrial, particularly in the context of a deadlocked jury. *Arizona*, 434 U.S. at 510-11. The United States Supreme Court has explained that there are "especially compelling" reasons for allowing the trial judge to exercise broad discretion in determining whether a mistrial is warranted based upon jury deadlock:

> On the one hand, if [the trial judge] discharges the jury when further deliberations may produce a fair verdict, the defendant is deprived of his 'valued right to have his trial completed by a particular tribunal.' But if [the trial judge] fails to discharge a jury which is unable to reach a verdict after protracted and exhausting deliberations, there exists a significant risk that a verdict may result from pressures inherent in the situation rather than the considered judgment of all the jurors. If retrial of the defendant were barred whenever an appellate court views the 'necessity' for a mistrial differently than the trial judge, there would be a danger that the latter, cognizant of the serious societal consequences of an erroneous ruling, would employ coercive means to break the apparent deadlock. Such a rule would frustrate the public interest in just judgments. The trial judge's decision to declare a mistrial

> when he considers the jury deadlocked is therefore accorded great deference by a reviewing court.

*Id.* at 509-10. The Supreme Court also has made clear that a trial court's failure to examine alternatives to declaring a mistrial or to make an explicit finding of manifest necessity alone does not negate the propriety of a mistrial *provided that* such a determination is supported by the record. *Id.* at 516-17; *see also Gantley*, 172 F.3d at 429-30.

But in recognizing the great deference to be accorded a trial court's mistrial decision, the Supreme Court did not endorse a rubber-stamp approach. Rather, the Court instructed:

> Our conclusion that a trial judge's decision to declare a mistrial based on his assessment of the prejudicial impact of improper argument is entitled to great deference does not, of course, end the inquiry. As noted earlier, a constitutionally protected interest is inevitably affected by any mistrial decision. The trial judge, therefore, "must always temper the decision whether or not to abort the trial by considering the importance to the defendant of being able, once and for all, to conclude his confrontation with society through the verdict of a tribunal he might believe to be favorably disposed to his fate." *United States v. Jorn*, 400 U.S.[470], at 486 [(1971)] (Harlan, J.). *In order to ensure that this interest is adequately protected, reviewing courts have an obligation to satisfy themselves that, in the words of Mr. Justice Story, the trial judge exercised "sound discretion" in declaring a mistrial.*
>
> Thus, if a trial judge acts irrationally or irresponsibly . . . his action cannot be condoned.

*Arizona*, 434 U.S. at 514 (emphasis added) (citations omitted). The Court in *Arizona v. Washington* was satisfied that the state trial judge properly exercised his discretion in that case because the record revealed that the lower court conducted a hearing on whether defense counsel's conduct required a mistrial, the state judge expressed and acknowledged concern over the double jeopardy consequences of his action, both sides were given an opportunity to explain their positions, and the judge considered the matter over two days. The record in the present case demonstrates none of these things.

When the trial judge has made no findings, provided no reasoning, articulated no justification, and entertained no argument from counsel, as in this case, a reviewing court must look to other objective clues in the record to determine whether the trial court exercised discretion in declaring a mistrial and to assess the soundness of the choice. In reversing the denial of a habeas writ sought on double jeopardy grounds, the Sixth Circuit held that several factors are to be considered when assessing whether "sound discretion" has been exercised, although no rigid test can be applied:

> In determining whether sound discretion has been exercised, several factors must be considered. These factors include: (1) a timely objection by the defendant; (2) the jury's collective opinion that it cannot agree on a verdict; (3) the length of the jury deliberations; (4) the length of the trial; (5) the complexity of the issues presented to the jury; (6) any proper communication which the judge has with the jury; (7) the effects of possible exhaustion and the impact which coercion of further deliberations might have on the verdict; and (8) the trial judge's belief that additional prosecutions will result in continued hung juries.

*Jones v. Hogg*, 732 F.2d 53, 56 (6th Cir. 1984).

The Michigan Supreme Court considered some of these factors when it observed that (1) the jury deliberated at least four hours following a "relatively short" and "far from complex" trial; (2) the jury sent out several notes, including one in which the jury expressed "concern about our voice levels disturbing any other proceedings that might be going on," *Lett*, 466 Mich. at 209 n.2, 644 N.W.2d at 745 n.2; (3) neither party objected; and (4) the jury foreperson responded in the negative to the judge's question whether they were going to reach a unanimous verdict. *Id*. at 223, 644 N.W.2d at 753. These bases for concluding that the trial judge exercised "sound discretion" in declaring that a mistrial was necessary are not particularly compelling.

Although the actual time that the jurors were in the courtroom may have been relatively short, the proceedings spanned ten days. According to the transcript of proceedings, the time for

trial (approximately fifteen hours) was about twice what the state supreme court estimated. In addition, it does not appear that the state supreme court accounted for the difficulty that can result from having to assemble information given to the jury in the piecemeal fashion that it was in this case. Altogether, seventeen witnesses testified at the first trial either in person or through the transcript of former proceedings. It is remarkable that a jury could review the testimony of all those witnesses in the time they were given, let alone conclude that they were deadlocked. Since the record does not reveal the time when the jurors commenced deliberations on June 13, it cannot be known with certainty how long they deliberated that day. However, the length of their deliberations does not lend support to the conclusion that a mistrial due to jury deadlock was manifestly necessary.

This conclusion is supported by comparison of this matter to other cases in which mistrials were declared after a relatively short period of deliberations. For instance, in *Shaw v. Norris*, 33 F.3d 958, 962 (8th Cir. 1994), the court of appeals referred to the trial judge's "unique vantage point" in affirming the declaration of a mistrial based upon jury deadlock after three and one-half hours of deliberations. But in that case, the jury sent a note that it was deadlocked six-six, the court then gave additional instructions regarding deadlock and encouraged them to re-examine their positions, the jury reached a partial verdict on one of the counts and declared an impasse on the other two counts, and one juror had taken ill. In *Lyons v. Jackson*, 820 F.2d 1225, 1987 WL 36108, *3 (6th Cir. 1987) (Table), the court of appeals held that declaration of a mistrial was not an abuse of discretion, explaining that "there is no doubt that an experienced trial judge has the best vantage point to determine whether further jury deliberations would be appropriate." The circumstances in that case, however, were that the trial proofs lasted three days, the jury retired to deliberate on a

Thursday afternoon, it deliberated all day Friday, late in the day the court gave a modified *Allen* charge, the jury recessed over the weekend and deliberated Monday morning, the jury expressly stated in a note they could not reach agreement on either count, the court sought input from counsel, and then declared mistrial.

The state supreme court inferred from the jurors' note expressing concern over their voice levels that the deliberations were acrimonious. However, there is no other suggestion in the record that such was the case, and the trial judge did not draw that conclusion. Jurors often disagree, and sometimes express that disagreement with enthusiasm, but there is nothing in this record that lends support to the conclusion that the jury was overwhelmed with disharmony or that it would not be able to reach a unanimous verdict given sufficient time.

The state court also pointed to the absence of objection to the mistrial from defense counsel. Certainly, lack of objection is a factor to consider if it can lead to the conclusion of acquiescence in the trial judge's actions. However, as acknowledged by the state supreme court, there is no evidence in this record that the trial judge ever advised counsel as to the substance of the jury's note or engaged counsel in any discussion. To the contrary, it appears that the trial judge acted precipitously, and her announcement of a mistrial was the first notice defense counsel had of the court's intended action. An objection after the fact perhaps would have completed the record, but it is unlikely that it would have changed the result. In the absence of any discussion by counsel on the record of any nature concerning the termination of the first trial, the lack of objection does little to fortify the conclusion that a mistrial was necessary.

The most weighty factor considered by the state supreme court was the jury forewoman's response to the trial judge's question whether the jury was "going to reach a unanimous verdict[]

or not? . . . Yes or no?" Trial Tr. at 320 (June 13, 1997). The state supreme court characterized the response as an unequivocal statement that the jury could not reach a unanimous verdict. However, that is not an accurate description of what occurred.

The on-the-record exchange between the trial judge and the jury forewoman was precipitated by a note, but that note did *not* report that the jury was deadlocked. The jury merely asked the judge what the consequences would be if they could not agree on a verdict. Therefore, the note itself cannot be considered any real evidence of a deadlock.

More importantly, once in the courtroom, the foreperson did not "expressly state[] that the jury was not going to reach a verdict," *Lett*, 466 Mich. at 223, 644 N.W.2d at 753, as the state supreme court described the exchange. When first asked whether the jury was "hopelessly deadlocked," the foreperson responded by stating that "[t]he majority of us don't believe that –," at which point the trial judge interrupted. Trial Tr. at 320 (June 13, 1997). This Court does not fault the trial judge for cutting off the foreperson so as to preserve the secrecy of jury deliberations. However, this truncated exchange tends to show that the foreperson did not feel prepared to declare definitively that the jury was hopelessly deadlocked. Yet a definitive answer is exactly what the trial judge demanded, and the record demonstrates that the foreperson was corralled, in a matter of seconds, into taking a stance one way or the other. Immediately after interrupting the foreperson, the trial judge asked, "Are you going to reach a unanimous verdict, or not?" *Ibid.* The foreperson apparently felt unconfident in answering this question, as a pause appears on the record. The pause was understandable. Although very direct, the trial judge's query was actually rather ambiguous; it did not, for instance, specify the time-line for reaching a unanimous verdict. The foreperson could have easily thought the judge meant, "Are you going to reach a unanimous verdict *in the next hour*?"

-15-

or "*before the lunch recess?*" or "*by the end of the day?*" This is particularly plausible in light of the judge's apparent and – based on the absence of any justification in the record, irrational – rush to resolve the issue. Rather than clarify what she intended, however, the judge pressed on. "Yes or no?," she asked. Trial Tr. at 320 (June 13, 1997). The foreperson answered, "No, Judge." *Ibid.* Although that response may sound definitive in isolation, viewed in context it is not. A fair reading of the record does not permit the conclusion that the jury unequivocally informed the trial judge that it would not reach a unanimous verdict within a reasonable time.

The decision to declare a mistrial in this case unreasonably terminated the proceedings and trenched upon the petitioner's right to "conclude his confrontation with society through the verdict of a tribunal he might believe to be favorably disposed to his fate." *United States v. Jorn*, 400 U.S. 470, 486 (1971) (Harlan, J.). There are no statements in the record by the trial judge that give reasonable clues as to the reasons for her hasty decision to end jury deliberations, and the objective evidence in the record does not demonstrate jury deadlock. The Court cannot conclude that a mistrial was a "manifest necessity" or that the state trial judge exercised "sound discretion" in declaring a mistrial. Although the trial judge's decision is entitled to great deference, it is not the place of a reviewing court to extract factoids from the record in an attempt to salvage a bad decision.

The Supreme Court has obligated reviewing courts to ensure that a "trial judge exercised 'sound discretion' in declaring a mistrial." *Arizona*, 434 U.S. at 514. In finding that the trial judge's declaration of a mistrial in this case was a proper exercise of that discretion, the state supreme court unreasonably applied federal law as stated in *Arizona v. Washington*. The mistrial was not

manifestly necessary in this case. Therefore, the defendant's second trial and ensuing conviction violated the petitioner's rights under the Double Jeopardy Clause.

III.

For the reasons stated, the Court concludes that the decision of the Michigan Supreme Court is an unreasonable application of federal law as determined by the United States Supreme Court.

Accordingly, it is **ORDERED** that the petition for a writ of habeas corpus is **GRANTED**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated: August 31, 2007

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on August 31, 2007.

s/Felicia M. Moses
FELICIA M. MOSES